JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

'09 CIV 8024

CONSTRUCCIONES INTEGRALES DEL
CARMEN, SA de CV,

Case No.: 09 CV _____ (   )

Plaintiff,

VERIFIED COMPLAINT

- against -

OCEANTEAM POWER & UMBILICAL
SHIPPING A.S. NORTH OCEAN 2 KS,

Defendant.
------------------------------------------------------------X

RECEIVED
SEP 18 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff CONSTRUCCIONES INTEGRALES DEL CARMEN, SA de CV

("Plaintiff"), by and through its attorneys, Clyde & Co US LLP, as and for its Verified

Complaint against the Defendant OCEANTEAM POWER & UMBILICAL SHIPPING A.S.

NORTH OCEAN 2 KS ("Defendant"), alleges upon information and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. § 1333.

2.     At all times material hereto, Plaintiff was and is a foreign business entity duly

organized and existing under the laws of Mexico.

3.     Upon information and belief, at all times material hereto, Defendant was and is a

foreign business entity duly organized and existing under the laws of Norway.

4.     On or about September 13, 2007, Plaintiff, as charterer, and Defendant, as owner,

entered into a charterparty, with Amendment Nos. 2 and 3, for the vessel "NORTH OCEAN"

(the "Vessel") for a period of 5 years (the Charterparty").  A copy of the Charterparty is attached

hereto as Exhibit "A."

5. Pursuant to the terms of the Charterparty, Plaintiff paid to Defendant a performance deposit in the amount of $1,980,000 in lieu of a bank guarantee in accordance with clause 41 of the Charterparty.

6. Pursuant to the terms of the Charterparty, Plaintiff paid to Defendant the sum of $3,120,000 for the cost of upgrades to the Vessel in accordance with Amendment No. 2, clause 51 of the Charterparty.

5. Pursuant to the terms of the Charterparty, Plaintiff was entitled to delivery of the Vessel between September 1-30, 2009. *See* Charterparty, Amendment No. 3, clause 57.

6. On or about August 28, 2009, Defendant advised Plaintiff that it would not be able to deliver the Vessel to Plaintiff in accordance with the time specified in the Charterparty because the Vessel was under charter to another entity, and instead advised Plaintiff that it would not be able to deliver the Vessel to Plaintiff until on or about July 1, 2010. *See* Defendant's letter dated August 28, 2009, a copy of which is attached hereto as Exhibit "B."

7. As a result of Defendant's failure to deliver the Vessel by the agreed upon delivery date, Plaintiff exercised its right to cancel the Charterparty in accordance with clause 2C thereof. *See* Plaintiff's letter dated August 28, 2009, attached hereto as Exhibit "C."

8. After the cancellation of the Charterparty, Plaintiff demanded that Defendant return to it the sums of $1,980,000 and $3,120,000 that had been paid by Plaintiff to Defendant under the Charterparty. Despite this demand, Defendant has failed and refused to return this money to Plaintiff as it is required to do under the Charterparty.

9. Defendant's failure to return this money to Plaintiff constitutes a breach of the Charterparty.

10. As a result of Defendant's breach of the Charterparty, Plaintiff has sustained damages in the total principal amount of at least $5,100,000 ($1,980,000 + $3.120,000), exclusive of interests, costs and attorneys' fees.

11. Plaintiff has complied with all terms and obligations of the Charterparty.

12. The Charterparty provides that all disputes thereunder are to be referred to arbitration in London, with English law to apply. *See* Charterparty, Part II, clause 34. Plaintiff is in the process of commencing the arbitration.

11. Interest, costs and attorneys' fees routinely are awarded to the prevailing party in London arbitration. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | Principal claim | $5,100,000.00; |
| B. | Estimated interest on claim- | |
| | 3 years at 7.5% compounded quarterly: | $1,273,553.52; |
| C. | Estimated attorneys' fees and expenses: | $ 250,000.00; |
| | Total: | $6,623,553.52. |

12. Upon information and belief, Defendant is and during the pendency of this litigation will continue to be engaged in international maritime commerce.

13. International business transactions such as those engaged in by Defendant in the regular course of its business operations frequently require payments to be made in U.S. Dollars. *See e.g.*, Charterparty, boxes 12 and 20 (requiring payment to be made in US$).

14. Upon information and belief, because Defendant is and will continue to be during the pendency of this litigation engaged in international commerce, it will continue to enter into business transactions requiring that the payments be made in U.S. Dollars.

15.     Upon information and belief, U.S. Dollar payments made pursuant to international commercial transactions of the type engaged in by Defendant frequently are made via electronic fund transfers. Approximately 95% of all electronic funds transfers between non-U.S. parties transacting business in U.S. Dollars are made via the Clearing House Interbank Payments System ("CHIPS"). These payments involve routing the electronic funds transfers through a CHIPS participating bank, usually located in New York City, operating as an intermediary bank, in order to convert the foreign currency into U.S. Dollars.

16.     Upon information and belief, because Defendant is and will continue to be during the pendency of this litigation engaged in international commerce, it will continue to make or receive some or all of the payments involved in that commerce in U.S. Dollars, and some or all of those payments will be made via electronic funds transfers processed through the CHIPS system, and will be routed through a CHIPS participating bank located in New York City (within this District) in order to convert the foreign currency into U.S. Dollars.

17.     Under the law of the Second Circuit, electronic funds transfers to or from a party in the hands of an intermediary bank are considered to be the property of that party and can be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 436 (2d Cir. 2006).

18.     Accordingly, upon information and belief, Defendant has or will have during the pendency of this litigation assets in this District in the form of electronic funds transfers at banks located in this District.

19.     Defendant cannot be found within this District within the meaning of Rule B but, upon information and belief, Defendant has, or will have during the pendency of this action,

assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

20.     The Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching any assets of the Defendant held by any garnishees within the District, for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claims as described above.

WHEREFORE, Plaintiff prays as follows:

A.     That process in due form of law issue against Defendant, citing Defendant to appear and answer under oath all and singular the matters alleged in the Verified Complaint failing which default judgment be entered against it in the sum of $6,623,553.52;

B.     That since the Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all goods, chattels, credits, letters of credit, bills of lading, effects, electronic fund transfers, debts and monies, tangible or intangible, or any funds up to the amount of $6,623,553.52 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

D.    That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

E.    That in the alternative, this Court enter Judgment against the Defendant on the

claims set forth herein;

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action;

and

G.    That the Plaintiff has such other, further and different relief as the Court may

deem just and proper.

Dated: September 18, 2009
       New York, New York

CLYDE & CO US LLP

By:
Christopher Carlsen (CC 9628)
405 Lexington Avenue
New York, New York 10174
Tel: (212) 710-3900
Christopher.carlsen@clydeco.us

Attorneys for Plaintiff

**EXHIBIT A**

First issued 1975.
Revised 1989 and 2005.

Printed by BIMCO's

Adopted by
International Support Vessel
Owners
Association (ISOA), London

Copyright published by
BIMCO, Copenhagen

# BIMCO

**TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS**
**CODE NAME: SUPPLYTIME 2005**                    PART I

| | |
|---|---|
| **1.** Place and date of contract<br>**13th September 2007, Miami** | |

| | |
|---|---|
| **2.** Owners/Place of business (full style, address, e-mail and fax no.)<br>**Oceanteam Power & Umbilical Shipping AS North Ocean 2 KS**<br>**Tveiterasvelen 12**<br>**P O Box 463, Nesttun**<br>**N-5863 Bergen**<br>**Norway**<br>**Tel: 0047 55108240**<br>**Fax: 0047 55108249**<br>**Attn: Mr Haico Halbesma** | **3.** Charterers/Place of business (full style, address, e-mail and fax no.)<br>**Construcciones Integrales del Carmen, SA de CV**<br>**Lote 1 "B" Manzana "M"**<br>**Parque Industrial Portuario**<br>**Laguna Azul**<br>**Ciudad del Carmen**<br>**Campeche**<br>**Mexico**<br><br>**Tel: 0052 938 38 4 45 47**<br>**Fax: 0052 938 38 4 45 48**<br>**Email: baycal2003@gmail.com** |

| | | |
|---|---|---|
| **4.** Vessel's name and IMO number (ANNEX A)<br>**North Ocean 102**<br>**IMO Number: TBA** | **5.** Date of delivery (Cl. 2(a) and (c))<br>**30th June 2008** | **6.** Cancelling date (Cl. 2(a) and (c))<br>**30th September 2008** |

| | |
|---|---|
| **7.** Port or Place of delivery (Cl. 2(a))<br>**Ciudad del Carmen (Mexico) outer pilot station**<br><br>**Acceptance of the vessel shall be Vigo (Spain) or other designated port.** | **8.** Port or place redelivery/notice of redelivery (Cl. 2(d))<br><br>(i) Port or place of redelivery<br>**Ciudad del Carmen (Mexico) outer pilot station or other mutually agreed port**<br><br>(ii) Number of days' notice of redelivery<br>**7 days** |

| | |
|---|---|
| **9.** Period of hire (Cl. 1(a))<br>**5 years** | **10.** Extension of period of hire (optional) (Cl. 1(b))<br><br>(i) Period of extension<br>**See clause 36**<br><br>(ii) Advance notice for declaration of option (days)<br>**180 days** |

| | |
|---|---|
| **11.** Automatic extension period to complete voyage or well (Cl. 1(c))<br><br>(i) Voyage or well (state which)<br>**Work in hand**<br><br>(ii) Maximum extension period (state number of days)<br>**7 days** | **12.** Mobilisation charge (Cl. 2(b)(i))<br><br>(i) Lump sum<br>**US$ 1,245,000**<br><br>(ii) When due<br>**Payable prior to departure of vessel from Metalships yard (Spain)** |

| | | |
|---|---|---|
| **13.** Early termination of charter (state amount of hire payable) (Cl. 31(a))<br>(i) State yes, if applicable<br>**Yes**<br><br>(ii) If yes, state amount of hire payable<br>**Balance of charter hire payable up to end of firm period** | **14.** Number of days' notice of early termination (Cl. 31(a))<br>**60 days** | **15.** Demobilisation charge (lump sum)<br>(Cl. 2(e) and Cl. 31 (a))<br>**Nil** |

| | |
|---|---|
| **16.** Area of operation (Cl. 6(a))<br>**Gulf of Mexico or as directed by Charterers by always within INL.** | **17.** Employment of vessel restricted to (state nature of service(s)(s)) (Cl. 6(a))<br>**Saturation and air diving, subsea operations and associated activities always within the natural and specified capabilities and capacities of this vessel.** |

| | |
|---|---|
| **18.** Specialist operations (Cl. 6(a))<br><br>(i) State if vessel may be used for ROV operations<br>**Yes**<br><br>(ii) State if vessel may be employed as a diving platform<br>**Yes** | **19.** Bunkers (Cl. 10)<br><br>(i) Quantity of bunkers on delivery and redelivery<br>**To be agreed at on hire**<br><br>(ii) Price of bunkers on delivery<br>**Market price on the day**<br><br>(iii) Price for bunkers on redelivery<br>**Market price on the day**<br><br>(iv) Fuel specifications and grades for fuel supplied by Charterers<br>**MGO** |

continued

| 20. Charter hire (state rate and currency) (Cl. 12(a) , (d) and (e)) <br><br> Upon arrival at delivery port of Ciudad del Carmen, the charter hire payable for the first 10 (ten) days ONLY is US$ 43,250 per day or part thereof, excluding fuel, lubes and water, net to Owners. Thereafter the rate shall be US$ 66,000 per day pro rata, excluding fuel, lubes and water | 21. Extension hire (if agreed, state rate) (Cl 12(b)) <br><br> US$ 66,000 per day or part thereof, excluding fuel, lubes and water. |
|---|---|
| 22. Invoicing for hire and other payments (Cl 12(d)) <br><br> (i) State whether to be issued in advance or arrears <br> **Monthly in arrears** <br><br> (ii) State by whom to be issued if other than the party stated in Box 2 <br> **See Box 2** <br><br> (iii) State to whom to be issued if addressee other than stated in Box 3 <br> **See Box 3** | 23. Payments (state mode and place of payment; also state beneficiary and bank account ) (Cl 12(e)) <br><br> **Payable to Owners by telegraphic transfer as per Owner's invoice** |
| 24. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl 12(e)) <br> **Immediately on receipt of invoice into Charterer's account** | 25. Interest rate payable (Cl. 12(e)) <br> **1.5% per month** | 26. Maximum audit period (Cl. 12(g)) <br> **4 months after completion of charter** |
| 27. Meals (state rate agreed) (Cl. 6(c)(ii)) <br> **See Clause 43** | 28. Accommodation (state rate agreed) (Cl. 6(c)(ii)) <br> **See Clause 43** | 29. Sublet (state amount of daily increment of charter hire) (Cl. 20) <br> **No sublet allowable** |

| 30. War Cancellation (indicate countries agreed) (Cl. 23) <br> **Permanent members of the UN Security Council** |
|---|
| 31. General Average (Place of settlement - only to be filled in if other than London) (Cl. 26) |
| 32. Taxes (Payable by Owners) (Cl. 30) <br><br> **The owner shall pay taxes arising in its country of registration  flag state of the Vessel. The charterer shall pay all other taxes and dues arising out of the operation or use of the vessel during the charter  period.** |
| 33. Breakdown (State period) (Cl. 31(b)(vi)) <br> **30 days** |
| 34. Dispute resolution (state (a), (b) or (c) of Cl. 34, as agreed; if (c) agreed also state Place of Arbitration) (Cl. 34) <br> **Cl. 34 (a)** |
| 35. Numbers of additional clauses covering special provisions, if agreed. <br> **TBA (confirm once additional clauses have been agreed)** |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses, if any agreed and stated in Box 35, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further.

| Signature (Owners) <br><br> *H.HAlbesma* | Signature (Charterers) |
|---|---|

**Definitions**   1
**"Owners"** shall mean the party stated in Box 2   2
**"Charterers"** shall mean the party stated in Box 3   3
**"Vessel"** shall mean the vessel named in Box 4 and   4
with particulars stated in ANNEX "A"   5
**"Well"** shall mean the time required to drill, test,   6
complete and/or abandon a single borehole including   7
any side-track thereof.   8
**"Offshore Unit"** shall mean any vessel, offshore   9
installation, structure and/or mobile unit used in offshore   10
exploration, construction, pipe-laying or repair,   11
exploitation or production.   12
**"Employees"** shall mean employees, directors,   13
officers, servants, agents or invitees.   14

**1. Charter Period**   15
(a) The Owners let and the Charterers hire the Vessel   16
for the period as stated in Box 9 from the time the Vessel   17
is delivered to the Charterers.   18
(b) Subject to Clause 12(b), the Charterers have the   19
option to extend the Charter Period in direct continuation   20
for the period stated in additional clause 39 Box 10(ii), but such   21
an option  
must be declared in accordance with additional clause 39 Box   22
10(ii).  
(c) The Charter Period shall automatically be   23
extended for the time required to complete the voyage   24
or well (whichever is stated in Box 11(ii)) in progress,   25
such time not to exceed the period stated in Box 11(ii).   26

**2. Delivery and Redelivery**   27
(a) Delivery. - Subject to Clause 2(b) the Vessel shall   28
be delivered by the Owners free of cargo and with clean   29
tanks at any time between the date stated in Box 5 and   30
the date stated in Box 6 at the port or place stated in   31
Box 7 where the Vessel can safely lie always afloat.   32
(b) Mobilisation. –   33
(i) The Charterers shall pay a lump sum mobilisation   34
charge as stated in Box 12 without discount.   35
(ii) Should the Owners agree to the Vessel loading   36
and transporting cargo and/or undertaking any   37
other service for the Charterers en route to the   38
port of delivery or from the port of redelivery, then   39
all terms and conditions of this Charter Party shall   40
apply to such loading and transporting and/or   41
other service exactly as if performed during the   42
Charter Period excepting only that any lump sum   43
freight agreed in respect thereof shall be payable   44
and earned on shipment or commencement of   45
the service as the case may be, the Vessel and/   46
or goods lost or not lost.   47
(c) Cancelling. - If the Vessel is not delivered by   48
midnight local time on the cancelling date stated in Box   49
6, the Charterers shall be entitled to cancel this Charter   50
Party. However, if the Owners will be unable to deliver   51
the Vessel by the cancelling date, they may give notice   52
in writing to the Charterers at any time prior to the delivery   53
date as stated in Box 5 and shall state in such notice the   54
date by which they will be able to deliver the Vessel. The   55
Charterers may within 24 hours of receipt of such notice   56
give notice in writing to the Owners cancelling this Charter   57
Party. If the Charterers do not give such notice, then the   58
later date specified in the Owners' notice shall be   59
substituted for the cancelling date for all the purposes of   60
this Charter Party. In the event the Charterers cancel   61
the Charter Party, it shall terminate on terms that neither   62
party shall be liable to the other for any losses incurred   63
by reason of the non-delivery of the Vessel or the   64
cancellation of the Charter Party.   65

(d) Redelivery. - The Vessel shall be redelivered on   66
the expiration or earlier termination of this Charter Party   67
free of cargo and with clean tanks at the port or place   68
as stated in Box 8(i) or such other port or place as may   69
be mutually agreed. The Charterers shall give not less   70
than the number of days notice in writing of their intention   71
to redeliver the Vessel, as stated in Box 8(ii).   72
~~(e) Demobilisation. - The Charterers shall pay a lump~~   73
~~sum demobilisation charge without discount in the amount~~   74
~~as stated in Box 15 which amount shall be paid on the~~   75
~~expiration or on earlier termination of this Charter Party.~~   76

**3. Condition of Vessel**   77
(a) The Owners undertake that at the date of delivery   78
under this Charter Party the Vessel shall be of the   79
description and Class as specified in ANNEX "A",   80
attached hereto, and in a thoroughly efficient state of   81
hull and machinery.   82
(b) The Owners shall exercise due diligence to   83
maintain the Vessel in such Class and in every way fit   84
for the service stated in Clause 6 throughout the period   85
of this Charter Party.   86

**4. Structural Alterations and Additional Equipment**   87
The Charterers shall, at their expense, have the option   88
of making structural alterations to the Vessel or installing   89
additional equipment with the written consent of the   90
Owners, which shall not be unreasonably withheld.   91
Unless otherwise agreed, the Vessel is to be redelivered   92
reinstated, at the Charterers' expense, to her original   93
condition. The Vessel is to remain on hire during any   94
period of these alterations or reinstatement. The   95
Charterers shall at all times be responsible for repair   96
and maintenance of any such alteration or additional   97
equipment. However, the Owners may, upon giving   98
notice, undertake any such repair and maintenance at   99
the Charterers' expense, when necessary for the safe   100
and efficient performance of the Vessel.   101

**5. Survey**   102
The Owners and the Charterers shall jointly appoint an   103
independent surveyor for the purpose of determining   104
and agreeing in writing, the condition of the Vessel, any   105
anchor-handling and-towing equipment specified in   106
ANNEX "A", and the quality and quantity of fuel,   107
lubricants and water at the time of delivery and redelivery   108
hereunder. The Owners and the Charterers shall jointly   109
share the time and expense of such surveys.   110

**6. Employment and Area of Operation**   111
(a) The Vessel shall be employed in offshore activities   112
which are lawful in accordance with the law of the place   113
of the Vessel's flag and/or registration and of the place   114
of operation. Such activities shall be restricted to the   115
service(s) as stated in Box 17, and to voyages between   116
any good and safe port or place and any place or   117
offshore unit where the Vessel can safely lie always   118
afloat within the Area of Operation as stated in Box 16   119
which shall always be within International Navigation   120
Limits and which shall in no circumstances be exceeded   121
without prior agreement and adjustment of the Hire and   122
in accordance with such other terms as appropriate to   123
be agreed; provided always that the Charterers do not   124
warrant the safety of any such port or place or offshore   125
unit but shall exercise due diligence in issuing their   126
orders to the Vessel as if the Vessel were their own   127
property and having regard to her capabilities and the   128
nature of her employment.   129
Unless otherwise stated in Box 18(i), the Charterers   130
shall not have the right to use the Vessel for ROV   131



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

operations. Unless otherwise stated in Box 18(ii), the 132
Vessel shall not be employed as a diving platform. 133
**(b)** Relevant permission and licences from responsible 134
authorities for the Vessel to enter, work in and leave 135
the Area of Operation shall be obtained by the 136
Charterers and the Owners shall assist, if necessary, 137
in every way possible to secure such permission and 138
licences. 139
**(c)** The Vessel's Space. - The whole reach and burden 140
and decks of the Vessel shall throughout the Charter 141
Period be at the Charterers' disposal reserving proper 142
and sufficient space for the Vessel's Master, Officers, 143
Crew, tackle, apparel, furniture, provisions and stores. 144
The Charterers shall be entitled to carry, so far as space 145
is available and for their purposes in connection with 146
their operations: 147
(i)  Persons other than crew members, other than fare 148
paying, and for such purposes to make use of 149
the Vessel's available accommodation not being 150
used on the voyage by the Vessel's Crew. ~~The~~ 151
~~Owners shall provide suitable provisions and~~ 152
~~requisites for such persons for which the~~ 153
~~Charterers shall pay at the rate as stated in Box~~ 154
~~27 per meal and at the rate as stated in Box 28~~ 155
~~per day for the provision of bedding and services~~ 156
~~for persons using berth accommodation.~~ 157
(ii)  Lawful cargo whether carried on or under deck. 158
(iii)  Explosives and dangerous cargo whether in bulk 159
or packaged, provided proper notification has 160
been given and such cargo is marked and packed 161
in accordance with the national regulations of the 162
Vessel and/or the International Maritime Danger- 163
ous Goods Code and/or other pertinent regula- 164
tions. Failing such proper notification, marking or 165
packing the Charterers shall indemnify the Own- 166
ers in respect of any loss, damage or liability 167
whatsoever and howsoever arising therefrom. The 168
Charterers accept responsibility for any additional 169
expenses (including reinstatement expenses) in- 170
curred by the Owners in relation to the carriage 171
of explosives and dangerous cargo. 172
(iv)  Hazardous or noxious substances, subject to 173
Clause 14(f), proper notification and any pertinent 174
regulations. 175
**(d)** ~~Laying-up of Vessel. - The Charterers shall have~~ 176
~~the option of laying up the Vessel at an agreed safe~~ 177
~~port or place for all or any portion of the Charter Period~~ 178
~~in which case the Hire hereunder shall continue to be~~ 179
~~paid but, if the period of such lay-up exceeds 30~~ 180
~~consecutive days, there shall be credited against such~~ 181
~~Hire the amount which the Owners shall reasonably~~ 182
~~have saved by way of reduction in expenses and~~ 183
~~overheads as a result of the lay-up of the Vessel.~~ 184

**7.  Master and Crew** 185
**(a)**  (i) The Master shall carry out his duties promptly 186
and the Vessel shall render all reasonable 187
services within her capabilities by day and by night 188
and at such times and on such schedules as the 189
Charterers may reasonably require without any 190
obligations of the Charterers to pay to the Owners 191
or the Master, Officers or the Crew of the Vessel 192
any excess or overtime payments. The Charterers 193
shall furnish the Master with all instructions and 194
sailing directions and the Master and Engineer 195
shall keep full and correct logs accessible to the 196
Charterers or their agents. 197
(ii) (1) No Bills of Lading shall be issued for 198
shipments under this Charter Party. 199

(2) The Master shall sign cargo documents as 200
directed by the Charterers in the form of receipts 201
that are non-negotiable documents and which are 202
clearly marked as such. 203
(3) The Charterers shall indemnify the Owners 204
against all liabilities that may arise from the signing 205
of such cargo documents in accordance with the 206
directions of the Charterers to the extent that the 207
terms of such cargo documents impose more 208
onerous liabilities than those assumed by the 209
Owners under the terms of this Charter Party. 210
**(b)**  The Vessel's Crew if required by Charterers will 211
connect and disconnect electric cables, fuel, water and 212
pneumatic hoses when placed on board the Vessel in 213
port as well as alongside the offshore units; will operate 214
the machinery on board the Vessel for loading and 215
unloading cargoes; and will hook and unhook cargo on 216
board the Vessel when loading or discharging alongside 217
offshore units. If the port regulations or the seamen and/ 218
or labour unions do not permit the Crew of the Vessel to 219
carry out any of this work, then the Charterers shall make, 220
at their own expense, whatever other arrangements may 221
be necessary, always under the direction of the Master. 222
**(c)**  If the Charterers have reason to be dissatisfied 223
with the conduct of the Master or any Officer or member 224
of the Crew, the Owners on receiving particulars of the 225
complaint shall promptly investigate the matter and if 226
the complaint proves to be well founded, the Owners 227
shall as soon as reasonably possible make appropriate 228
changes in the appointment. 229
**(d)**  The entire operation, navigation, and management 230
of the Vessel shall be in the exclusive control and 231
command of the Owners, their Master, Officers and 232
Crew. The Vessel will be operated and the services 233
hereunder will be rendered as requested by the 234
Charterers, subject always to the exclusive right of the 235
Owners or the Master of the Vessel to determine 236
whether operation of the Vessel may be safely 237
undertaken. In the performance of the Charter Party, 238
the Owners are deemed to be an independent 239
contractor, the Charterers being concerned only with 240
the results of the services performed. 241

**8.  Owners to Provide** 242
**(a)**  The Owners shall provide and pay for all 243
Provisions, wages and all other expenses of the Master, 244
Officers and Crew; all maintenance and repair of the 245
Vessel's hull, machinery and equipment as specified in 246
ANNEX "A"; also, except as otherwise provided in this 247
Charter Party, for all insurance on the Vessel, all dues 248
and charges directly relative to the Vessel's flag and/or 249
registration, all deck, cabin and engineroom stores, 250
cordage required for ordinary ship's purposes mooring 251
alongside in harbour, and all fumigation expenses and 252
de-ratisation certificates. The Owners' obligations under 253
this Clause extend to cover all liabilities for consular 254
charges appertaining to the Master, Officers and Crew, 255
customs or import duties arising at any time during the 256
performance of this Charter Party in relation to the 257
personal effects of the Master, Officers and Crew, and 258
in relation to the stores, provisions and other matters 259
as aforesaid which the Owners are to provide and/or 260
pay for and the Owners shall refund to the Charterers 261
any sums they or their agents may have paid or been 262
required to pay in respect of such liability. 263
**(b)** ~~On delivery the Vessel shall be equipped, if~~ 264
~~appropriate, at the Owners' expense with any towing and~~ 265
~~anchor handling equipment specified in ANNEX "A".~~ 266

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense coused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**9. Charterers to Provide**

(a) While the Vessel is on hire the Charterers shall 267
provide and pay for all fuel, lubricants, water, 268
dispersants, firefighting foam and transport thereof, port 269
charges, pilotage and boatmen and canal steersmen 270
(whether compulsory or not), launch hire (unless 271
incurred in connection with the Owners' business), light 272
dues, tug assistance, canal, dock, harbour, tonnage and 273
other dues and charges, agencies and commissions 274
incurred on the Charterers' business, costs for security 275
or other watchmen, and of quarantine (if occasioned 276
by the nature of the cargo carried or the ports visited 277
whilst employed under this Charter Party but not 278
otherwise). 279

(b) At all times the Charterers shall provide and pay 280
for the loading and unloading of cargoes so far as not 281
done by the Vessel's crew, cleaning of cargo tanks, all 282
necessary dunnage, uprights and shoring equipment 283
for securing deck cargo, all cordage except as to be 284
provided by the Owners, all ropes, slings and special 285
runners (including bulk cargo discharge hoses) actually 286
used for loading and discharging, inert gas required for 287
the protection of cargo, and electrodes used for offshore 288
works, and shall reimburse the Owners for the actual 289
cost of replacement of special mooring lines to offshore 290
units, wires, nylon spring lines etc. used for offshore 291
works, all hose connections and adaptors, and further, 292
shall refill oxygen/acetylene bottles used for offshore 293
works. 294

(c) Upon entering into this Charter Party or in any 295
event no later than the time of delivery of the Vessel 296
the Charterers shall provide the Owners with copies of 297
any operational plans or documents which are 298
necessary for the safe and efficient operation of the 299
Vessel. All documents received by the Owners shall be 300
returned to the Charterers on redelivery. 301

(d) The Charterers shall pay for customs duties, all 302
permits, import duties (including costs involved in 303
establishing temporary or permanent importation 304
bonds), and clearance expenses, both for the Vessel 305
and/or equipment, required for or arising out of this 306
Charter Party. 307

(e) ~~The Charterers shall pay for any replacement of~~ 308
~~any anchor handling/towing/lifting wires and accessories~~ 309
~~which have been placed on board by the Owners or the~~ 310
~~Charterers, should such equipment be lost, damaged or~~ 311
~~become unserviceable, other than as a result of the~~ 312
~~Owners' negligence.~~ 313

(f) The Charterers shall pay for any fines, taxes or 314
imposts levied in the event that contraband and/or 315
unmanifested drugs and/or cargoes are found to have 316
been shipped as part of the cargo and/or in containers 317
on board. The Vessel shall remain on hire during any 318
time lost as a result thereof. However, if it is established 319
that the Master, Officers and/or Crew are involved in 320
smuggling then any financial security required shall be 321
provided by the Owners. 322

**10. Bunkers**

(a) Quantity at Delivery/Redelivery. – The Vessel shall 323
be delivered with at least the quantity of fuel as stated 324
in Box 19 (i) and the Vessel shall be redelivered with 325
about the same quantity as on delivery, provided always 326
that the quantity of fuels at redelivery is at least sufficient 327
to allow the Vessel to safely reach the nearest port at 328
which fuels of the required type or better are available. 329

(b) Purchase Price. – The Charterers shall purchase 330
the fuels on board at delivery at the price prevailing at 331
the time and port of delivery unless otherwise stated in 332

Box 19 (ii) and the Owners shall purchase the fuels on 335
board at redelivery at the price prevailing at the time 336
and port of redelivery unless otherwise stated in Box 337
19 (iii). The Charterers shall purchase the lubricants 338
on board at delivery at the list price and the Owners 339
shall purchase the lubricants on board at redelivery at 340
the list price. 341

(c) Bunkering. – The Charterers shall supply fuel of the 342
specifications and grades stated in Box 19 (iv). The fuels 343
shall be of a stable and homogeneous nature and unless 344
Otherwise agreed in writing, shall comply with ISO 345
standard 8217:1996 or any subsequent amendments 346
thereof as well as with the relevant provisions of 347
MARPOL. The Chief Engineer shall co-operate with the 348
Charterers' bunkering agents and fuel suppliers and 349
comply with their requirements during bunkering, 350
including but not limited to checking, verifying and 351
acknowledging sampling, reading or soundings, meters 352
etc. before, during and/or after delivery of fuels. During 353
delivery four representative samples of all fuels shall be 354
taken at a point as close as possible to the Vessel's 355
bunker manifold. The samples shall be labelled and 356
sealed and signed by suppliers, Chief Engineer and the 357
Charterers or their agents. Two samples shall be retained 358
by the suppliers and one each by the Vessel and the 359
Charterers. If any claim should arise in respect of the 360
quality or specification or grades of the fuels supplied, 361
the samples of the fuels retained as aforesaid shall be 362
analysed by a qualified and independent laboratory. 363

(d) Liability. – The Charterers shall be liable for any 364
loss or damage to the Owners caused by the supply of 365
unsuitable fuels or fuels which do not comply with the 366
specifications and grades set out in Box 19 (iv) and the 367
Owners shall not be held liable for any reduction in the 368
Vessel's speed performance and/or increased bunker 369
consumption nor for any time lost and any other 370
consequences arising as a result of such supply. 371

**11. BIMCO ISPS/MTSA Clause for Time Charter Parties**

(a) (i) The Owners shall comply with the requirements 372
of the International Code for the Security of Ships 373
and of Port Facilities and the relevant amendments 374
to Chapter XI of SOLAS (ISPS Code) relating to 375
The Vessel and "the Company" (as defined by the 376
ISPS Code). If trading to or from the United States 377
or passing through United States waters, the 378
Owners shall also comply with the requirements 379
of the US Maritime Transportation Security Act 380
2002 (MTSA) relating to the Vessel and the 381
"Owner" (as defined by the MTSA). 382

(ii) Upon request the Owners shall provide a copy of 383
The relevant International Ship Security Certificate 384
(or the Interim International Ship Security 385
Certificate) to the Charterers. The Owners shall 386
provide the Charterers with the full style contact 387
details of the Company Security Officer (CSO). 388

(iii) Except as otherwise provided in this Charter Party, 389
loss, damages, expense or delay (excluding 390
consequential loss, damages, expense or delay) 391
caused by failure on the part of the Owners or 392
"the Company"/"Owner" to comply with the 393
requirements of the ISPS Code/MTSA or this 394
Clause shall be for the Owners' account. 395

(b) (i) The Charterers shall provide the Owners and 396
The Master with their full style contact details and, 397
upon request, any other information the Owners 398
require to comply with the ISPS Code/MTSA. 399
Furthermore, the Charterers shall ensure that all 400
Sub-charter parties they enter into during the 401
402



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

period of this Charter Party contain the following provision: 403, 404

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners". 405, 406, 407, 408, 409, 410

(ii) Except as otherwise provided in this Charter Party, loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account. 411, 412, 413, 414, 415, 416

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account. 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party. 429, 430, 431

**12. Hire and Payments**

(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box 20 per day or pro rata for part thereof from the time that the Vessel is delivered to the Charterers until the expiration or earlier termination of this Charter Party. 432, 433, 434, 435, 436, 437

(b) Extension Hire. - If the option to extend the Charter Period under Clause 1(b) is exercised, Hire for such extension shall, unless stated in Box 21, be agreed between the Owners and the Charterers. Should the parties fail to reach an agreement, then the Charterers shall not have the option to extend the Charter Period. 438, 439, 440, 441, 442, 443

(c) Adjustment of Hire. - The rate of hire shall be adjusted to reflect documented changes, after the date of entering into the Charter Party or the date of commencement of employment, whichever is earlier, in the Owners' costs arising from changes in the Charterers' requirements, or regulations governing the Vessel and/or its Crew or this Charter Party or the application thereof. 444, 445, 446, 447, 448, 449, 450, 451

(d) Invoicing. - All invoices shall be issued in the contract currency stated in Box 20. In respect of reimbursable expenses incurred in currencies other than the contract currency, the rate of exchange into the contract currency shall be that quoted by the Central Bank of the country of such other currency as at the date of the Owners' invoice. Invoices covering Hire and any other payments due shall be issued monthly as stated in Box 22(i) or at the expiration or earlier termination of this Charter Party. Notwithstanding the foregoing, bunkers and lubricants on board at delivery shall be invoiced at the time of delivery. 452, 453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463

(e) Payments. - Payments of Hire, bunker invoices and disbursements for the Charterers' account shall be received within the number of days stated in Box 24 from the date of receipt of the invoice. Payment shall be made in the currency stated in Box 20 in full without discount to the account stated in Box 23. 464, 465, 466, 467, 468, 469

However, any advances for disbursements made on 470

behalf of and approved by the Owners may be deducted from Hire due. 471, 472

If payment is not received by the Owners within 5 banking days following the due date the Owners are entitled to charge interest at the rate stated in Box 25 on the amount outstanding from and including the due date until payment is received. 473, 474, 475, 476, 477

Where an invoice is disputed, the Charterers shall notify the Owners before the due date and in any event pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed portion provided that such portion is reasonably disputed and the Charterers specify such reason. Interest will be chargeable at the rate stated in Box 25 on such disputed amounts where resolved in favour of the Owners. Should the Owners prove the validity of the disputed portion of the invoice, balance payment shall be received by the Owners within 5 banking days after the dispute is resolved. Should the Charterers' claim be valid, a Corrected invoice shall be issued by the Owners. 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490

(f) (i) Where there is a failure to pay Hire by the due date, the Owners shall notify the Charterers in writing of such failure and further may also suspend The performance of any or all of their obligations under this Charter Party until such time as all the Hire due to the Owners under the Charter Party has been received by the Owners. Throughout any period of suspended performance under this Clause, the Vessel is to be and shall remain on Hire. The Owners' right to suspend performance under this Clause shall be without prejudice to any other rights they may have under this Charter Party. 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502

(ii) If after 5 days of the written notification referred to in Clause 12(f)(i) the Hire has still not been received the Owners may at any time while Hire remains outstanding withdraw the Vessel from the Charter Party. The right to withdraw is to be exercised promptly and in writing and is not dependent upon the Owners first exercising the right to suspend performance of their obligations under the Charter Party pursuant to Clause 12(f)(i) above. The receipt by the Owners of a payment from the Charterers after the five day period referred to above has expired but prior to the notice of withdrawal shall not be deemed a waiver of the Owners' right to cancel the Charter Party. 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516

(iii) Where the Owners choose not to exercise any of The rights afforded to them by this Clause in respect of any particular late payment of Hire, or a series of late payments of Hire, under the Charter Party, this shall not be construed as a waiver of their right either to suspend performance under Clause 12(f)(i) or to withdraw the Vessel from the Charter Party under Clause 12(f)(ii) in respect of any subsequent late payment under this Charter Party. 517, 518, 519, 520, 521, 522, 523, 524, 525, 526

(iv) The Charterers shall indemnify the Owners in respect of any liabilities incurred by the Owners under the Bill of Lading or any other contract of carriage as a consequence of the Owners' proper suspension of and/or withdrawal from any or all of their obligations under this Charter Party. 527, 528, 529, 530, 531, 532

(g) Audit. - The Charterers shall have the right to appoint an independent chartered accountant to audit the Owners' books directly related to work performed under this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 26, to determine the validity of the Owners' 533, 534, 535, 536, 537, 538

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



charges hereunder. The Owners undertake to make 539
their records available for such purposes at their 540
principal place of business during normal working hours. 541
Any discrepancies discovered in payments made shall 542
be promptly resolved by invoice or credit as appropriate. 543

**13.    Suspension of Hire** 544
    **(a)** If as a result of any deficiency of Crew or of the 545
Owners' stores, strike of Master, Officers and Crew, 546
breakdown of machinery, damage to hull or other 547
accidents to the Vessel, the Vessel is prevented from 548
working, no Hire shall be payable in respect of any time 549
lost and any Hire paid in advance shall be adjusted 550
accordingly provided always however that Hire shall 551
not cease in the event of the Vessel being prevented 552
from working as aforesaid as a result of: 553
    (i) the carriage of cargo as noted in Clause 6(c)(iii) 554
        and (iv); 555
    (ii) quarantine or risk of quarantine unless caused by 556
        the Master, Officers or Crew having communication 557
        with the shore at any infected area not in 558
        connection with the employment of the Vessel 559
        without the consent or the instructions of the 560
        Charterers; 561
    (iii) deviation from her Charter Party duties or 562
        exposure to abnormal risks at the request of the 563
        Charterers; 564
    (iv) detention in consequence of being driven into port 565
        or to anchorage through stress of weather or 566
        trading to shallow harbours or to river or ports 567
        with bars or suffering an accident to her cargo, 568
        when the expenses resulting from such detention 569
        shall be for the Charterers' account howsoever 570
        incurred; 571
    (v) detention or damage by ice; 572
    (vi) any act or omission of the Charterers, their 573
        servants or agents. 574
    **(b)** Liability for Vessel not Working. – The Owners' 575
liability for any loss, damage or delay sustained by the 576
Charterers as a result of the Vessel being prevented 577
from working by any cause whatsoever shall be limited 578
to suspension of hire, except as provided in Clause 579
11(a)(iii). 580
    **(c)** Maintenance and Drydocking. – Notwithstanding 581
Clause 13(a), the Charterers shall grant the Owners a 582
maximum of 24 hours on hire, which shall be 583
cumulative, per month or pro rata for part of a month 584
from the commencement of the Charter Period for 585
maintenance and repairs including drydocking 586
(hereinafter referred to as "maintenance allowance"). 587
The Vessel shall be drydocked at regular intervals. The 588
Charterers shall place the Vessel at the Owners' 589
disposal clean of cargo, at a port (to be nominated by 590
the Owners at a later date) having facilities suitable to 591
the Owners for the purpose of such drydocking. 592
During reasonable voyage time taken in transits 593
between such port and Area of Operation the Vessel 594
shall be on hire and such time shall not be counted 595
against the accumulated maintenance allowance. 596
Hire shall be suspended during any time taken in 597
maintenance repairs and drydocking in excess of the 598
accumulated maintenance allowance. 599
In the event of less time being taken by the Owners for 600
repairs and drydocking or, alternatively, the Charterers 601
not making the Vessel available for all or part of this 602
time, the Charterers shall, upon expiration or earlier 603
termination of the Charter Party, pay the equivalent of 604
the daily rate of Hire then prevailing in addition to Hire 605
otherwise due under this Charter Party in respect of all 606

such time not so taken or made available. 607
Upon commencement of the Charter Period, the Owners 608
Agree to furnish the Charterers with the Owners' 609
proposed drydocking schedule and the Charterers 610
Agree to make every reasonable effort to assist the 611
Owners in adhering to such predetermined drydocking 612
schedule for the Vessel. 613

**14.    Liabilities and Indemnities** 614
    **(a)** Definitions 615
For the purpose of this Clause "Owners' Group" shall 616
Mean: the Owners, and their contractors and sub- 617
contractors , and Employees of any of the foregoing. 618
For the purpose of this Clause "Charterers' Group" shall 619
Mean: the Charterers, and their contractors, sub- 620
contractors, co-venturers and customers (having a 621
contractual relationship with the Charterers, always with 622
respect to the job or project on which the Vessel is 623
employed, and Employees of any of the foregoing. 624
    **(b)** Knock for Knock 625
    (i) Owners. - Notwithstanding anything else contained 626
        in this Charter Party excepting Clauses 6(c)(iii), 627
        9(b) 9(e), 9(f), 10(d), 11, 12(f)(iv), 14(d), 15(c), 628
        18(c), 26 and 27, the Charterers shall not be 629
        responsible for loss of or damage to the property 630
        of any member of the Owners' Group, including 631
        the Vessel, or for personal injury or death of any 632
        member of the Owners' Group arising out of or in 633
        any way connected with the performance of this 634
        Charter Party, even if such loss, damage, injury or 635
        death is caused wholly or partially by the act, 636
        neglect, or default of the Charterers' Group, and 637
        even if such loss, damage, injury or death is caused 638
        wholly or partially by unseaworthiness of any 639
        vessel; and the Owners shall indemnify, protect, 640
        defend and hold harmless the Charterers from any 641
        and against all claims, costs, expenses, actions, 642
        proceedings, suits, demands and liabilities 643
        whatsoever arising out of or in connection with such 644
        loss, damage, personal injury or death. 645
    (ii) Charterers. - Notwithstanding anything else 646
        contained in this Charter Party excepting Clause 647
        11, 15(a), 16 and 26, the Owners shall not be 648
        responsible for loss of, damage to, or any liability 649
        arising out of anything towed by the Vessel, any 650
        cargo laden upon or carried by the Vessel or her 651
        tow, the property of any member of the Charterers' 652
        Group , whether owned or chartered, including 653
        their Offshore Units, or for personal injury or death 654
        of any member of the Charterers' Group or of 655
        anyone on board anything towed by the Vessel, 656
        arising out of or in any way connected with the 657
        performance of this Charter Party, even if such 658
        loss, damage, liability, injury or death is caused 659
        wholly or partially by the act, neglect or default of 660
        the Owners' Group, and even if such loss, 661
        damage, liability, injury or death is caused wholly 662
        or partially by the unseaworthiness of any vessel 663
        and the Charterers shall indemnify, protect, 664
        defend and hold harmless the Owners from any 665
        and against all claims, costs, expenses, actions, 666
        proceedings, suits, demands, and liabilities 667
        whatsoever arising out of or in connection with 668
        such loss, damage, liability, personal injury or 669
        death. 670
    **(c)** Consequential Damages.- 671
Neither party shall be liable to the other for any 672
consequential damages whatsoever arising out of or in 673
connection with the performance or non-performance 674



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

of this Charter Party, and each party shall protect, defend    675
and indemnify the other from and against all such claims    676
from any member of its Group as defined in Clause    677
14(a).    678
"Consequential damages" shall include, but not be    679
limited to, loss of use, loss of profits, shut-in or loss of    680
production and cost of insurance, whether or not    681
foreseeable at the date of this Charter Party.    682

**(d)** Limit ations.-    683
Nothing contained in this Charter Party shall be    684
construed or held to deprive the Owners or the    685
Charterers, as against any person or party, including    686
as against each other, of any right to claim limitation of    687
liability provided by any applicable law, statute or    688
convention, save that nothing in this Charter Party shall    689
create any right to limit liability. Where the Owners or    690
the Charterers may seek an indemnity under the    691
provisions of this Charter Party or against each other in    692
respect of a claim brought by a third party, the Owners    693
or the Charterers shall seek to limit their liability against    694
such third party.    695

**(e)** Himalaya Clause.-    696
(i)    All exceptions, exemptions, defences, immunities,    697
limitations of liability, indemnities, privileges and    698
conditions granted or provided by this Charter Party    699
or by any applicable statute, rule or regulation for    700
the benefit of the Charterers shall also apply to    701
and be for the benefit of the Charterers' parent,    702
affiliated, related and subsidiary companies; the    703
Charterers' contractors, sub-contractors, co-    704
venturers and customers (having a contractual    705
relationship with the Charterers, always with    706
respect to the job or project on which the Vessel is    707
employed) ; their respective Employees and their    708
respective underwriters.    709
(ii)    All exceptions, exemptions, defences, immunities,    710
limitations of liability, indemnities, privileges and    711
conditions granted or provided by this Charter Party    712
or by any applicable statute, rule or regulation for    713
the benefit of the Owners shall also apply to and    714
be for the benefit of the Owners' parent, affiliated,    715
related and subsidiary companies, the Owners'    716
contractors, sub-contractors, the Vessel, its Master,    717
Officers and Crew, its registered owner, its operator,    718
its demise charterer(s), their respective Employees    719
and their respective underwriters.    720
(iii)    The Owners or the Charterers shall be deemed    721
to be acting as agent or trustee of and for the    722
benefit of all such persons and parties set forth    723
above, but only for the limited purpose of    724
contracting for the extension of such benefits to    725
such persons and parties.    726

**(f)** Hazardous or Noxious Subst ances.-    727
Notwithstanding any other provision of this Charter Party    728
to the contrary, the Charterers shall always be    729
responsible for any losses, damages or liabilities    730
suffered by the Owners' Group, by the Charterers, or    731
by third parties, with respect to the Vessel or other    732
property, personal injury or death, pollution or otherwise,    733
which losses, damages or liabilities are caused, directly    734
or indirectly, as a result of the Vessel's carriage of any    735
hazardous or noxious substances in whatever form as    736
ordered by the Charterers, and the Charterers shall    737
defend, indemnify the Owners and hold the Owners    738
harmless for any expense, loss or liability whatsoever    739
or howsoever arising with respect to the carriage of    740
hazardous or noxious substances.    741

**15.    Pollution**    742

**(a)**    Except as otherwise provided for in Clause 18(c)(iii),    743
the Owners shall be liable for, and agree to indemnify,    744
defend and hold harmless the Charterers against all    745
Claims, costs, expenses, actions, proceedings, suits,    746
demands and liabilities whatsoever arising out of actual    747
or threatened pollution damage and the cost of cleanup    748
or control thereof arising from acts or omissions of the    749
Owners or their personnel which cause or allow    750
discharge, spills or leaks from the Vessel, except as may    751
emanate from cargo thereon or therein.    752
**(b)**    The Charterers shall be liable for and agree to    753
indemnify, defend and hold harmless the Owners from    754
all claims, costs, expenses, actions, proceedings, suits,    755
demands, liabilities, loss or damage whatsoever arising    756
out of or resulting from any other actual or threatened    757
pollution damage, even where caused wholly or partially    758
by the act, neglect or default of the Owners, their    759
Employees, contractors or sub-contractors or by the    760
unseaworthiness of the Vessel.    761
**(c)**    The Charterers shall, upon giving notice to the    762
Owners or the Master, have the right but shall not be    763
obliged) to place on board the Vessel and/or have in    764
attendance at the site of any pollution or threatened    765
incident one or more Charterers' representative to    766
observe the measures being taken by Owners and/or    767
national or local authorities or their respective servants,    768
agents or contractors to prevent or minimise pollution    769
damage and to provide advice, equipment or manpower    770
or undertake such other measures, at Charterers' risk    771
and expense, as are permitted under applicable law    772
and as Charterers believe are reasonably necessary to    773
prevent or minimise such pollution damage or to remove    774
the threat of pollution damage.    775

**16.    Wreck Removal**    776
If the Vessel becomes a wreck and is an obstruction to    777
navigation and has to be removed by order of any lawful    778
authority having jurisdiction over the area where the    779
Vessel is placed or as a result of compulsory law, the    780
Owners shall be liable for any and all expenses in    781
connection with the raising, removal, destruction,    782
lighting or marking of the Vessel.    783

**17.    Insurance**    784
**(a)**    (i) The Owners shall procure and maintain in    785
effect for the duration of this Charter Party, with    786
reputable insurers, the Insurances set forth in    787
ANNEX "B".    788
Policy limits shall not be less than those indicated.    789
Reasonable deductibles are acceptable and shall    790
be for the account of the Owners.    791
(ii)    The Charterers shall upon request be named as    792
co-insured. The Owners shall upon request cause    793
insurers to waive subrogation rights against the    794
Charterers (as encompassed in Clause 14(e)(ii)).    795
Co-insurance and/or waivers of subrogation shall    796
be given only insofar as these relate to liabilities    797
which are properly the responsibility of the Owners    798
under the terms of this Charter Party.    799
**(b)**    The Owners shall upon request furnish the    800
Charterers with copies of certificates of insurance which    801
provide sufficient information to verify that the Owners    802
have complied with the insurance requirements of this    803
Charter Party.    804
**(c)**    If the Owners fail to comply with the aforesaid    805
insurance requirements, the Charterers may, without    806
prejudice to any other rights or remedies under this    807
Charter Party, purchase similar coverage and deduct    808
the cost thereof from any payment due to the Owners    809

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the
pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a
result of discrepancies between the original BIMCO approved document and this computer generated document.



under this Charter Party. 810

**18. Saving of Life and Salvage** 811
(a) The Vessel shall be permitted to deviate for the 812
purpose of saving life at sea without prior approval of 813
or notice to the Charterers and without loss of Hire 814
provided however that notice of such deviation is given 815
as soon as possible. 816
(b) Subject to the Charterers' consent, which shall not 817
be unreasonably withheld, the Vessel shall be at liberty 818
to undertake attempts at salvage, it being understood 819
that the Vessel shall be off-hire from the time she leaves 820
port or commences to deviate and she shall remain 821
off-hire until she is again in every way ready to resume 822
the Charterers' service at a position which is not less 823
favourable to the Charterers than the position at the 824
time of leaving port or deviating for the salvage services. 825
All salvage monies earned by the Vessel shall be divided 826
equally between the Owners and the Charterers, after 827
deducting the Master's, Officers' and Crew's share, legal 828
expenses, value of fuel and lubricants consumed, Hire 829
of the Vessel lost by the Owners during the salvage, 830
repairs to damage sustained, if any, and any other 831
extraordinary loss or expense sustained as a result of 832
the salvage. 833
The Charterers shall be bound by all measures taken 834
by the Owners in order to secure payment of salvage 835
and to fix its amount. 836
(c) The Owners shall waive their right to claim any 837
award for salvage performed on property owned by or 838
contracted to the Charterers, always provided such 839
property was the object of the operation the Vessel was 840
chartered for, and the Vessel shall remain on hire when 841
rendering salvage services to such property. This waiver 842
is without prejudice to any right the Vessel's Master, 843
Officers and Crew may have under any title. 844
If the Owners render assistance to such property in 845
distress on the basis of "no claim for salvage", then, 846
notwithstanding any other provisions contained in this 847
Charter Party and even in the event of neglect or default 848
of the Owners, Master, Officers or Crew: 849
(i) The Charterers shall be responsible for and shall 850
indemnify the Owners against payments made, 851
under any legal rights, to the Master, Officers and 852
Crew in relation to such assistance. 853
(ii) The Charterers shall be responsible for and shall 854
reimburse the Owners for any loss or damage 855
sustained by the Vessel or her equipment by 856
reason of giving such assistance and shall also 857
pay the Owners' additional expenses thereby 858
incurred. 859
(iii) The Charterers shall be responsible for any actual 860
or potential spill, seepage and/or emission of any 861
pollutant howsoever caused occurring within the 862
offshore site and any pollution resulting therefrom 863
wheresoever it may occur and including but not 864
limited to the cost of such measures as are 865
reasonably necessary to prevent or mitigate 866
pollution damage, and the Charterers shall 867
indemnify the Owners against any liability, cost 868
or expense arising by reason of such actual or 869
potential spill, seepage and/or emission. 870
(iv) The Vessel shall not be off-hire as a consequence 871
of giving such assistance, or effecting repairs 872
under Clause 18(c)(ii), and time taken for such 873
repairs shall not count against time granted under 874
Clause 13(c). 875
(v) The Charterers shall indemnify the Owners 876
against any liability, cost and/or expense 877

whatsoever in respect of any loss of life, injury, 878
damage or other loss to person or property 879
howsoever arising from such assistance. 880

**19. Lien** 881
The Owners shall have a lien upon all cargoes and 882
equipment for all claims against the Charterers under 883
this Charter Party and the Charterers shall have a lien 884
on the Vessel for all monies paid in advance and not 885
earned. The Charterers will not suffer, nor permit to be 886
continued, any lien or encumbrance incurred by them 887
or their agents, which might have priority over the title 888
and interest of the Owners in the Vessel. Except as 889
provided in Clause 14, the Charterers shall indemnify 890
and hold the Owners harmless against any lien of 891
whatsoever nature arising upon the Vessel during the 892
Charter Period while she is under the control of the 893
Charterers, and against any claims against the Owners 894
Arising out of the operation of the Vessel by the 895
Charterers or out of any neglect of the Charterers in 896
relation to the Vessel or the operation thereof. 897
Should the Vessel be arrested by reason of claims or 898
liens arising out of her operation hereunder, unless 899
brought about by the act or neglect of the Owners, the 900
Charterers shall at their own expense take all 901
reasonable steps to secure that within a reasonable time 902
the Vessel is released and at their own expense put up 903
bail to secure release of the Vessel. 904

**20. Sublet and Assignment** 905
~~(a)    Charterers - The Charterers shall have the option~~ 906
~~of subletting, assigning or leasing the Vessel to any~~ 907
~~Person or company not competing with the Owners,~~ 908
~~subject to the Owners' prior approval which shall not be~~ 909
~~unreasonably withheld, upon giving notice in writing to~~ 910
~~the Owners, but the original Charterers shall always~~ 911
~~remain responsible to the Owners for due performance~~ 912
~~of the Charter Party. The person or company taking such~~ 913
~~subletting, assigning or loan and their contractors and~~ 914
~~sub contractors shall be deemed contractors of the~~ 915
~~Charterers for all the purposes of this Charter Party.~~ 916
~~The Owners make it a condition of such consent that~~ 917
~~additional Hire shall be paid as agreed between the~~ 918
~~Charterers and the Owners in Box 29, having regard to~~ 919
~~the nature and period of any intended service of the~~ 920
~~Vessel.~~ 921
(b) Owners - The Owners may not assign or transfer 922
any part of this Charter Party without the written approval 923
of the Charterers, which approval shall not be 924
unreasonably withheld. Approval by the Charterers of 925
such subletting or assignment shall not relieve the 926
Owners of their responsibility for due performance of 927
the part of the services which is sublet or assigned. 928

**21. Substitute Vessel** 929
~~The Owners shall be entitled at any time, whether before~~ 930
~~delivery or at any other time during the Charter Period,~~ 931
~~to provide a substitute vessel, subject to the Charterers'~~ 932
~~prior approval which shall not be unreasonably withheld.~~ 933

**22. BIMCO War Risks Clause "CONWARTIME 2004"** 934
(a) For the purpose of this Clause, the words: 935
(i) "Owners" shall include the shipowners, bareboat 936
charterers, disponent owners, managers or other 937
operators who are charged with the management 938
of the Vessel, and the Master; and 939
(ii) "War Risks" shall include any actual, threatened 940
or reported war; act of war; civil war; hostilities; 941
revolution; rebellion; civil commotion; warlike 942
operations; laying of mines; acts of piracy; acts of 943



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

terrorists; acts of hostility or malicious damage; 944
blockades (whether imposed against all vessels 945
or imposed selectively against vessels of certain 946
flags or ownership, or against certain cargoes or 947
crews or otherwise howsoever); by any person, 948
body, terrorist or political group, or the Government 949
of any state whatsoever, which, in the reasonable 950
judgement of the Master and/or the Owners, may 951
be dangerous or are likely to be or to become 952
dangerous to the Vessel, her cargo, crew or other 953
persons on board the Vessel. 954
**(b)** The Vessel, unless the written consent of the 955
Owners be first obtained, shall not be ordered to or 956
required to continue to or through, any port, place, area 957
or zone (whether of land or sea), or any waterway or 958
canal, where it appears that the Vessel, her cargo, crew 959
or other persons on board the Vessel, in the reasonable 960
judgement of the Master and/or the Owners, may be, 961
or are likely to be, exposed to War Risks. Should the 962
Vessel be within any such place as aforesaid, which 963
only becomes dangerous, or is likely to be or to become 964
dangerous, after her entry into it, she shall be at liberty 965
to leave it. 966
**(c)** The Vessel shall not be required to load contraband 967
cargo, or to pass through any blockade, whether such 968
blockade be imposed on all vessels, or is imposed 969
selectively in any way whatsoever against vessels of 970
certain flags or ownership, or against certain cargoes 971
or crews or otherwise howsoever, or to proceed to an 972
area where she shall be subject, or is likely to be subject 973
to a belligerent's right of search and/or confiscation. 974
**(d)** (i) The Owners may effect war risks insurance in 975
respect of the Hull and Machinery of the 976
Vessel and their other interests (including, but not 977
limited to, loss of earnings and detention, the crew 978
and their Protection and Indemnity Risks), and 979
the premiums and/or calls therefor shall be for 980
their account. 981
(ii) If the Underwriters of such insurance should require 982
payment of premiums and/or calls because, 983
pursuant to the Charterers' orders, the Vessel is 984
within, or is due to enter and remain within, or pass 985
through any area or areas which are specified by 986
such Underwriters as being subject to additional 987
premiums because of War Risks, then the actual 988
premiums and/or calls paid shall be reimbursed 989
by the Charterers to the Owners at the same time 990
as the next payment of hire is due, or upon 991
redelivery, whichever occurs first. 992
**(e)** If the Owners become liable under the terms of 993
employment to pay to the crew any bonus or additional 994
wages in respect of sailing into an area which is 995
dangerous in the manner defined by the said terms, 996
then the actual bonus or additional wages paid shall be 997
reimbursed to the Owners by the Charterers at the same 998
time as the next payment of hire is due, or upon 999
redelivery, whichever occurs first. 1000
**(f)** The Vessel shall have liberty:- 1001
(i) to comply with all orders, directions, recommen- 1002
dations or advice as to departure, arrival, routes, 1003
sailing in convoy, ports of call, stoppages, desti- 1004
nations, discharge of cargo, delivery, or in any 1005
other way whatsoever, which are given by the 1006
Government of the Nation under whose flag the 1007
Vessel sails, or other Government to whose laws 1008
the Owners are subject, or any other Government, 1009
body or group whatsoever acting with the power 1010
to compel compliance with their orders or direc- 1011

tions; 1012
(ii) to comply with the order, directions or recommen- 1013
dations of any war risks underwriters who have 1014
the authority to give the same under the terms of 1015
the war risks insurance; 1016
(iii) to comply with the terms of any resolution of the 1017
Security Council of the United Nations, the 1018
effective orders of any other Supranational body 1019
which has the right to issue and give the same, 1020
and with national laws aimed at enforcing the 1021
same to which the Owners are subject, and to 1022
obey the orders and directions of those who are 1023
charged with their enforcement; 1024
(iv) to discharge at any other port any cargo or part 1025
thereof which may render the Vessel liable to 1026
confiscation as a contraband carrier; 1027
(v) to call at any other port to change the crew or any 1028
part thereof or other persons on board the Vessel 1029
when there is reason to believe that they may be 1030
subject to internment, imprisonment or other 1031
sanctions. 1032
**(g)** If in accordance with their rights under the 1033
foregoing provisions of this Clause, the Owners shall 1034
refuse to proceed to the loading or discharging ports, 1035
or any one or more of them, they shall immediately 1036
inform the Charterers. No cargo shall be discharged at 1037
any alternative port without first giving the Charterers 1038
notice of the Owners' intention to do so and requesting 1039
them to nominate a safe port for such discharge. Failing 1040
such nomination by the Charterers within 48 hours of 1041
the receipt of such notice and request, the Owners may 1042
discharge the cargo at any safe port of their own choice. 1043
**(h)** If in compliance with any of the provisions of sub- 1044
clauses (b) to (g) of this Clause anything is done or not 1045
done, such shall not be deemed a deviation, but shall 1046
be considered as due fulfilment of this Charter Party. 1047

**23. War Cancellation Clause 2004** 1048
Either party may cancel this Charter Party on the 1049
outbreak of war (whether there be a declaration of war 1050
or not) 1051
**(a)** between any two or more of the following countries: 1052
the United States of America; Russia; the United 1053
Kingdom; France; and the People's Republic of China, 1054
or, 1055
**(b)** between the countries stated in **Box 30.** 1056

**24. BIMCO Ice Clause for Time Charter Parties** 1057
**(a)** The Vessel shall not be obliged to force ice but, 1058
subject to the Owners' prior approval having due regard 1059
to its size, construction and class, may follow ice- 1060
breakers. 1061
**(b)** The Vessel shall not be required to enter or remain 1062
in any icebound port or area, nor any port or area where 1063
lights, lightships, markers or buoys have been or are 1064
about to be withdrawn by reason of ice, nor where on 1065
account of ice there is, in the Master's sole discretion, 1066
a risk that, in the ordinary course of events, the Vessel 1067
will not be able safely to enter and remain at the port or 1068
area or to depart after completion of loading or 1069
discharging. If, on account of ice, the Master in his sole 1070
discretion considers it unsafe to proceed to, enter or 1071
remain at the place of loading or discharging for fear of 1072
the Vessel being frozen in and/or damaged, he shall 1073
be at liberty to sail to the nearest ice-free and safe place 1074
and there await the Charterers' instructions. 1075
**(c)** Any delay or deviation caused by or resulting from 1076
ice shall be for the Charterers' account and the Vessel 1077
shall remain on-hire. 1078



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account. 1079 1080 1081 1082

**25.  Epidemic/Fever** 1083
The Vessel shall not be ordered to nor bound to enter without the Owners' written permission any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel. 1084 1085 1086 1087 1088
Notwithstanding the terms of Clause 13, Hire shall be paid for all time lost including any lost owing to loss of or sickness to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks. 1089 1090 1091 1092 1093

**26.  General Average and New Jason Clause** 1094
General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York-Antwerp Rules, 1994. 1095 1096 1097
Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply: 1098 1099 1100 1101
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. 1102 1103 1104 1105 1106 1107 1108 1109 1110 1111 1112
If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery". 1113 1114 1115 1116 1117 1118 1119 1120

**27.  Both-to-Blame Collision Clause** 1121
If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact. 1122 1123 1124 1125 1126 1127 1128 1129 1130 1131 1132 1133 1134 1135 1136 1137 1138 1139

**28.  Health and Safety** 1140
The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' 1141 1142 1143

instructions as may be appended hereto. 1144

**29.  Drugs and Alcohol Policy** 1145
The Owners undertake that they have, and shall maintain for the duration of this Charter Party, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship 1995 as amended from time to time. The Owners shall exercise due diligence to ensure that the D & A Policy is understood and complied with on and about the Vessel. An actual impairment, shall not in and itself mean that the Owners have failed to exercise due diligence. 1146 1147 1148 1149 1150 1151 1152 1153 1154 1155 1156

**30.  Taxes** 1157
Within the day rate the Owners shall be responsible for the taxes stated in Box 32 and the Charterers shall be responsible for all other taxes. 1158 1159 1160
In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly. 1161 1162 1163 1164 1165 1166 1167

**31.  Early Termination** 1168
(a)  At Charterers' Convenience. - The Charterers may terminate this Charter Party at any time by giving the Owners written notice of termination as stated in Box 14, upon expiry of which, this Charter Party will terminate. Upon such termination, Charterers shall pay the compensation for early termination stated in Box 13 and the demobilisation charge stated in Box 15, as well as Hire or other payments due under the Charter Party up to the time of termination. Should Box 13 be left blank, Clause 31(a) shall not apply. 1169 1170 1171 1172 1173 1174 1175 1176 1177 1178
(b)  For Cause. - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances: 1179 1180 1181 1182 1183 1184 1185 1186 1187
(i)  Requisition. - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period. 1188 1189 1190 1191 1192
(ii)  Confiscation. - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period (other than by way of arrest for the purpose of obtaining security). 1193 1194 1195 1196 1197 1198 1199
(iii)  Bankruptcy. - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business. 1200 1201 1202 1203 1204 1205
(iv)  Loss of Vessel. - If the Vessel is lost or becomes a constructive total loss, or is missing unless the Owners promptly state their intention to provide, and do in fact provide, within 14 days of the Vessel 1206 1207 1208 1209



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

being lost or missing, at the port or place from 1210
which the Vessel last sailed (or some other 1211
mutually acceptable port or place) a substitute 1212
vessel pursuant to Clause 21. In the case of 1213
termination, Hire shall cease from the date the 1214
Vessel was lost or, in the event of a constructive 1215
total loss, from the date of the event giving rise to 1216
such loss. If the date of loss cannot be ascertained 1217
or the Vessel is missing, payment of Hire shall 1218
cease from the date the Vessel was last reported. 1219

(v) Breakdown. - If, at any time during the term of 1220
this Charter Party a breakdown of the Owners' 1221
equipment or Vessel result in the Owners being 1222
unable to perform their obligations hereunder for 1223
~~a period exceeding (as stated in Box 33 and have~~ 1224
~~not initiated reasonable steps within 48 hours to~~ 1225
~~remedy the non-performance or provided a~~ 1226
~~substitute vessel pursuant to Clause 21.~~ 1227

(vi) Force Majeure. - If a force majeure condition as 1228
defined in Clause 32 prevents or hinders the 1229
performance of the Charter Party for a period 1230
exceeding 15 consecutive days from the time at 1231
which the impediment causes the failure to 1232
perform if notice is given without delay or, if notice 1233
is not given without delay, from the time at which 1234
notice thereof reaches the other party. 1235

(vii) Default. - If either party is in repudiatory breach 1236
of its obligations hereunder. 1237

Termination as a result of any of the above mentioned 1238
causes shall not relieve the Charterers of any obligation 1239
for Hire and any other payments. 1240

**32. Force Majeure** 1241
Neither party shall be liable for any loss, damage or 1242
delay due to any of the following force majeure events 1243
and/or conditions to the extent the party invoking force 1244
majeure is prevented or hindered from performing any 1245
or all of their obligations under this Charter Party, 1246
provided they have made all reasonable efforts to avoid, 1247
minimize or prevent the effect of such events and/or 1248
conditions: 1249

(a) acts of God; 1250
(b) any Government requisition, control, intervention, 1251
requirement or interference; 1252
(c) any circumstances arising out of war, threatened 1253
act of war or warlike operations, acts of terrorism, 1254
sabotage or piracy, or the consequences thereof; 1255
(d) riots, civil commotion, blockades or embargoes; 1256
(e) epidemics; 1257
(f) earthquakes, landslides, floods or other extraor- 1258
Dinary weather conditions; 1259
(g) strikes, lockouts or other industrial action, unless 1260
limited to the Employees of the party seeking to invoke 1261
force majeure; 1262
(h) fire, accident, explosion except where caused by 1263
negligence of the party seeking to invoke force majeure; 1264
(i) any other similar cause beyond the reasonable 1265
control of either party. 1266
The party seeking to invoke force majeure shall notify 1267
the other party in writing within 2 working days of the 1268
occurrence of any such event/condition. 1269

**33. Confidentiality** 1270
All information or data provided or obtained in 1271
connection with the performance of this Charter Party 1272
is and shall remain confidential and not be disclosed 1273
without the prior written consent of the other party. The 1274
Parties shall use their best efforts to ensure that such 1275
information shall not be disclosed to any third party by 1276

any of their sub-contractors, Employees and agents. 1277
This Clause shall not apply to any information or data 1278
that has already been published or is in the public 1279
domain. 1280
All information and data provided by a party is and shall 1281
remain the property of that party. 1282

**34. BIMCO Dispute Resolution Clause** 1283
*(a) This Charter Party shall be governed by and 1284
construed in accordance with English law and any 1285
dispute arising out of or in connection with this Charter 1286
Party shall be referred to arbitration in London in 1287
accordance with the Arbitration Act 1996 or any statutory 1288
modification or re-enactment thereof save to the extent 1289
necessary to give effect to the provisions of this Clause. 1290
The arbitration shall be conducted in accordance with 1291
the London Maritime Arbitrators Association (LMAA) 1292
Terms current at the time when the arbitration 1293
proceedings are commenced. 1294
The reference shall be to three arbitrators. A party 1295
wishing to refer a dispute to arbitration shall appoint its 1296
arbitrator and send notice of such appointment in writing 1297
to the other party requiring the other party to appoint its 1298
own arbitrator within 14 calendar days of that notice 1299
and stating that it will appoint its arbitrator as sole 1300
arbitrator unless the other party appoints its own 1301
arbitrator and gives notice that it has done so within the 1302
14 days specified. If the other party does not appoint its 1303
own arbitrator and give notice that it has done so within 1304
the 14 days specified, the party referring a dispute to 1305
arbitration may, without the requirement of any further 1306
prior notice to the other party, appoint its arbitrator as 1307
sole arbitrator and shall advise the other party 1308
accordingly. The award of a sole arbitrator shall be 1309
binding on both parties as if he had been appointed by 1310
agreement. 1311
Nothing herein shall prevent the parties agreeing in 1312
writing to vary these provisions to provide for the 1313
appointment of a sole arbitrator. 1314
In cases where neither the claim nor any counterclaim 1315
exceeds the sum of US$50,000 (or such other sum as 1316
the parties may agree) the arbitration shall be conducted 1317
in accordance with the LMAA Small Claims Procedure 1318
current at the time when the arbitration proceedings 1319
are commenced. 1320

~~*(b) This Charter Party shall be governed by and~~ 1321
~~construed in accordance with Title 9 of the United States~~ 1322
~~Code and the Maritime Law of the United States and~~ 1323
~~any dispute arising out of or in connection with this~~ 1324
~~Charter Party shall be referred to three persons at New~~ 1325
~~York, one to be appointed by each of the parties hereto,~~ 1326
~~and the third by the two so chosen; their decision or~~ 1327
~~that of any two of them shall be final, and for the~~ 1328
~~purposes of enforcing any award, judgement may be~~ 1329
~~entered on an award by any court of competent~~ 1330
~~jurisdiction. The proceedings shall be conducted in~~ 1331
~~accordance with the rules of the Society of Maritime~~ 1332
~~Arbitrators, Inc.~~ 1333
~~In cases where neither the claim nor any counterclaim~~ 1334
~~exceeds the sum of US$50,000 (or such other sum as~~ 1335
~~the parties may agree) the arbitration shall be conducted~~ 1336
~~in accordance with the Shortened Arbitration Procedure~~ 1337
~~of the Society of Maritime Arbitrators, Inc. current at~~ 1338
~~the time when the arbitration proceedings are~~ 1339
~~commenced.~~ 1340
~~*(c) This Charter Party shall be governed by and~~ 1341
~~construed in accordance with the laws of the place~~ 1342
~~mutually agreed by the parties and any dispute arising~~ 1343
~~out of or in connection with this Charter Party shall be~~ 1344

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



referred to arbitration at a mutually agreed place, subject to the procedures applicable there.

**(d)** Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter Party.

In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:

**(i)** Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

**(ii)** The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation; in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

**(iii)** If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

**(iv)** The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

**(v)** Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

**(vi)** Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties

shall share equally the mediator's costs and expenses.

**(vii)** The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*

If Box 34 in PART I is not appropriately filled in, sub-clause 34(a) of this Clause shall apply. Sub-clause (d) shall apply in all cases.

\* *Sub-clauses 34(a), 34(b) and 34(c) are alternatives; indicate alternative agreed in Box 34.*

**35. Notices**

**(a)** All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Charter Party shall be in writing.

**(b)** For the purposes of this Charter Party, "in writing" shall mean any method of legible communication. A notice may be given by any effective means including, but not limited to, cable, telex, fax, e-mail, registered or recorded mail, or by personal service.

**36. Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

**37. Severance**

If by reason of any enactment or judgement any provision of this Charter Party shall be deemed or held to be illegal, void or unenforceable in whole or in part, all other provisions of this Charter Party shall be unaffected thereby and shall remain in full force and effect.

**38. Entire Agreement**

This Charter Party, including all Annexes referenced herein and attached hereto, is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.



This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## ADDITIONAL CLAUSES

**39. Extension of hire - options**

At the expiry of the period of Hire pursuant to Clause 1 (a), the Charterer shall have the following options to extend Hire, provided the Charterer gives advanced written notice to the Owners as stated below:

4x 1 year (180 days notice)
3x 3 months (30 days notice)
2x 1 months (10 days notice)
30x 1 days (5 days notice)

**40. Commercial Proposal**

The Charterer and Owner hereby agree that the commercial terms set out in the Commercial Proposal dated 13/09/07 are incorporated into this Charter Party.

**41. Bank Guarantee**

The Charterer agrees to guarantee the payment of Hire in an amount equal to 1 month's Vessel Hire either by way of pre-payment or the provision of a bank guarantee in the form annexed at Annex C from a first class international bank acceptable to the Owner. If the Charterer elects to provide a bank guarantee to the Owner, it shall do so within 10 days of the date of this Charter Party.

**42. Subletting and Assignment by Charterer**

The Charterer shall not be entitled to sublet, assign or loan the Vessel to any person or company without the Owner's prior written approval.

**43. Permissible Delay**

For the purposes of clause 2(c), "Permissible Delay" means any delay in the delivery of the Vessel caused by a force majeure condition as defined in Clause 32 [or a Force Majeure Delay as defined in the shipbuilding contract between Metal Ship and Docks S.A.U and North Ocean 1 KS dated 2nd December 2005].

**44. Crane Operations and Maintenance**

The Charterer shall provide certified and capable crane drivers and is fully responsible for all crane operations, maintenance and repair (including wire) based on the planned maintenance system provided by crane manufacturer. Owner will provide the crane with manufacturer recommended spares list.

**45. Vessels insurance**

The Owners shall provide to the Charterer copies of the Vessels present insurances, and shall maintain these during the full length of the Charter Party. These include Hull & Machinery Insurance and P&I including pollution certificates as per the requirements set out in Pemex contracts, provided that any increased premium as a consequence of Pemex requirements shall be for Charterers account.

## 46. Clarification to Clause 13

a) Liability for vessel not working: in the event of the vessel not being able to operate for 100% due to breakdown of one of the non preferential systems the charter hire will be decreased with tba percentages

b) Maintenance & drydocking: owners agree that the vessel will only be drydocked as per Class regulations during the term of this charterparty unless a damage to the vessels hull or machinery occurs which does not allow the vessel to continue the service without repair. Owner shall however be entitled to carry out general maintenance work to the Vessel and the Vessel's equipment provided such maintenance, preventive or corrective work does not interfere with the Charterers work and operations as per clients work program in action at that time.

## 47 Vessels manning

The Charterer shall undertake to the Owners and provide that all personnel onboard so provided by the Charterer or any of its agents shall be qualified for the relevant services and position, and the qualification shall be in line with the statutory requirements pertaining to the vessel under its present registry and flag.

## 48 Crew Changes

The Owner shall be responsible for arranging timely relief of the Owners personnel onboard the vessel and which shall be achieved by Charterers fulfilling its obligations as set out hereunder.

When crew changes needs to be effected in or though a country that has any visa regulations, Charterer shall give the Owner sufficient notice thereof for the Owner to complete and obtain visa for the crew joining or leaving the Vessel.

When or where the crew change need to be effected offshore by helicopter or crewboat, Owner shall be responsible for the timely arrival and cost of any of their joining crew up to the appropriate heliport or ship berth. Charterers shall be responsible for the cost and the arrangement of the transport to the Vessels offshore location for all of the joining crew until their arrival on board the Vessel. The transportation cost arrangement for any crew leaving the Vessel for the offshore location shall be for the account of the Charterers until the crew's arrival onshore at an appropriate heliport or ships berth, from which point the Owner shall become responsible for all the repatriation arrangement and costs for Owners personnel only.

Charterers will make their own arrangements and be responsible for the costs incurred for the personnel change of those persons appointed and or supplied by the Charterers. Such arrangements shall be co-ordinated with the Owner and/or the master of the Vessel.

## 49 Charterers Markings and Logo

The Charterer have the right to display prominently on both sides of the vessel their logo and markings during the charter party. All reasonable cost associated with this for Owners accounts.



# INSURANCE

Insurance policies (as applicable) to be procured and
maintained by the Owners under Clause 17:

(1)  Marine Hull Insurance. – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the
Vessel.

(2)  Protection and Indemnity (Marine Liability Insurance. –
Protection and Indemnity (P&I) or Marine Liability Insurance with coverage equivalent to the cover provided by members of the International
Group Protection and Indemnity Associations with a limit of cover no less than USD          for any one event. The cover shall include liability
for collision and damage to fixed and floating objects to the extent not covered by the insurance in (1) above.

(3)  General Third Party Liability Insurance. – To the extent not covered by the insurance in (2) ABOVE, Coverage shall be for:
Bodily Injury          per person
Property Damage          per occurrence.

(4)  Workmen's Compensation and Employer's liability Insurance for Employees. –
To the extent not covered in the insurance in (2) above, covering Owners' employees and other persons for whom Owners are liable as
employer pursuant to applicable law for statutory benefits as set out and required by local law in area of operation or area in which the Owners
may become legally obliged to pay benefits.

~~(5)(Comprehensive General Automobile Liability Insurance. –~~
~~Covering all owned, hired and non-owned vehicles, coverage shall be for:~~
~~Bodily Injury          According to the local law.~~
~~Property Damage          In an amount equivalent to~~
~~single limit per occurrence.~~

(6)(5)    Such other insurances as may be agreed.



This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not
clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document

# ANNEX A

# VESSEL SPECIFICATION

Insert new vessel brochure when complete with all modifications as per meeting held in Miami on the 13th September 2007.







| | Rev : 03 |
| --- | --- |
| **OCEANTEAM** | Date : 7/09/07 |
| POWER & UMBILICAL | Client : CICSA |

**Commercial proposal North Ocean 102**

Date : 06/09/07
Client: CICSA
      Isla del Carmen
      Ciudad del Carmen, Mexico

Attn: Mr Mark Pasha (Kennedy Marr LTD)

**Proposal for provision of Construction Support Vessel North Ocean 102**

Dear Mr Pasha

Further to our recent discussions, we have pleasure in presenting to you this commercial proposal for the provision of the Construction Support Vessel North Ocean 102 (the "**Vessel**") for work to be performed in the Gulf of Mexico.

Please note that our technical manager Mr Knut Rabben will be available and assist with any technical questions you may have which could include a yard inspection.

Please also note that any changes on cranes and deck layout need to be analyst and approved by DNV.

If you have any further questions please do not hesitate to contact me.

With kind regards,

Lex van Doorn
Director Shipping
Oceanteam Power & Umbilical
lex.vandoorn@oceanteam.net
Tel: +31653200250





# OCEANTEAM
## POWER & UMBILICAL

## 1.0 INTRODUCTION

This proposal has been prepared by Oceanteam Power & Umbilical Shipping AS ("Oceanteam") in response to an enquiry from Kennedy Marr Limited on behalf of CICSA.
This document proposes pricing and commercial terms for the provision of the dynamically positioned Construction Support Vessel North Ocean 102.

## 2.0 SCOPE OF WORK

Oceanteam offers the Vessel along with associated services to undertake the Client's work scope provided always that the Client satisfies itself that the Vessel's capability, as set out in the Vessel Specification, is suitable for such work scope. Please see attached Vessel Specification.

The following equipment will be onboard the Vessel to support the sub-sea operations to be undertaken by the Client in its works scope:

☐ 2 AHC cranes as mentioned in the specs.

In the event that client will downgrade on number of AHC cranes a discount of US$ 1,250 will be applicable per crane. Any costs involved in upgrade, recertification and redesign etc out of the original specifications will be charged to client at cost + 10%. Reinstatement applicable.

The Vessel will have onboard an Oceanteam Offshore Manager at owners discretion, who shall be responsible for the daily management of services to be provided by us, and the interface between the Vessel and the Client.

Subject to sufficient notice and agreement commercial terms, Oceanteam is able to provide additional support services, if requested to do so by the Client.

## 3.0 SCHEDULES

### 3.1 Delivery

Vigo outer pilot station or other safe port to be mutually agreed.

### 3.2 Redelivery

Aberdeen outer pilot station or other safe port to be mutually agreed.

### 3.3 Period

The Vessel shall be available for a firm period of 5 years.
Options in charters favour:   4x 1 year (90 days notice)
                                 3x 3 months (30 days notice)
                                 2x 1 months (10 days notice)
                                 30x 1 days





**OCEANTEAM**
POWER & UMBILICAL

## 4.0 COMMERCIAL

### 4.1 Schedule of Pricing

Currency of payment is US Dollar.

**Activity Rates**

| | |
|---|---|
| Delivery Lump Sum: | US$ 1,245,000 |
| Daily Operating rate: | US$ 56,000 |
| Mobilization Rate: | US$ 43,250 with a maximum of 10 days |
| Redelivery Lump Sum: | N/A |
| Victualling per day / per man: | To be provided and paid by CICSA |
| Any additional services Cost + 15% | |

### 4.2 Inclusions

- Marine and Project Manning as per section 5.1
- Positioning and Survey equipment spread as per 5.5

### 4.3 Exclusions

- Fuel, lubes and water at cost + 10%
- All project specific equipment
- Agency fees, Vessel and personnel permit fees, clearance fees, berthing fees, pilot fees and shore side craneage at cost + 10%
- Victualling
- All import/export taxes, withholding tax and any other fiscal imposts in the countries of operation
- Any increased insurance costs
- Client communications, e-mail or telephone, to be charged at cost +10%
- Costs for the modification to the Vessel to suit Client supplied equipment
- All costs associated with mobilization and demobilization of Client equipment including sea fastening and warranty surveyor
- Costs incurred as a result of weather down time

### 4.4 Validity

All clients subjects to approval to be lifted at latest 9th September 2007
This offer is valid until close of business on 9 September 2007

---



**OCEANTEAM**
**POWER & UMBILICAL**

| | |
|---|---|
| Rev : 03 |
| Date : 7/09/07 |
| Client : CICSA |

**4.5 Terms and Conditions of Offer**

This proposal is subject to the following terms and conditions:

A) Oceanteam Board Approval

B) The Vessel's availability as can be ascertained at the time of contract signature.

C) Agreement to enter into a BIMCO Supply time 2005 charter party or similar charter party Agreement incorporating such amendments as may be agreed between the parties.

D) Payment term will be 10 (Ten) days from issue date of invoice. Day rates are applicable to a day or part there of and are not pro rata.

E) Pre-Payment or the provision of a Bank Guarantee from a First Class International Bank for 1 month Vessel hire ten days after agreement main terms to secure the vessel.

F) Monthly payment to be handle through trust account structure whereby Pemex payments are paid into escrow account with Oceanteam as the beneficiary of payment related to Time Charter. Specific details to be agreed.

G) Oceanteam will invoice the Client at the end of each calendar month (and/or at the end of each period of hire) the daily rate for the Vessel, equipment and rechargeable items at the agreed rates in respect of such period.

H) Client is responsible for transportation and cost of helicopter or crew boat transfer for the crew transfer between vessel and Ciudad del Carmen or Dos Bocas. Client is also responsible to provide transportation of vessel's crew to and from the nearest airport / port and the vessel.

I) The Vessel daily rates will be applicable from delivery in Vigo.

J) Operating Daily rate applies during Client mobilization, demobilization, transit, standby and waiting on Weather.

K) The spread will accrue and accumulate 24 hours of maintenance time for every month of operations pro-rata.

L) Oceanteam shall not be liable for any loss or damage to Client property, regardless of whether such loss or damage was caused by, or contributed to, by the negligence of Oceanteam or its sub-contractors. For the purposes of this clause any pipeline, cable, umbilical, and/or any other equipment or plant which is the subject of the work (Product) will be considered to be Client property.

M) Oceanteam shall pay taxes arising in its country of registration and flag state of the Vessel. The Client shall pay all other taxes and dues arising out of the operations or use of the Vessel during the charter period.

N) Any additional costs incurred by Oceanteam outside the scope of work as may be instructed by the Client in the form of a variation, will be payable by the Client at cost +15%.

### 4.6 Disputes.

In the case of disputed invoices, the Client shall pay any undisputed amount and shall notify Oceanteam of the disputed amount in writing within 5 days of receipt of invoice.

### 5.0 VESSEL AND SUPPORT EQUIPMENT

The Vessel Specification for the North Ocean 102 will be send with this proposal. More detailed information can be provided upon request.

### 5.1 Marine and Project Manning

Oceanteam intends that the marine and support services be provided in a cooperative and operationally effective manner, although Oceanteam Shipping will always retain ultimate authority in respect of the Vessel and any additional services provided.

Oceanteam will arrange provision of a 24 hour service on DP under IMCA guidelines in support of Charterers operations.

The following crew will be provided for the vessel in case victualing is provided by client.

- One master experienced with offshore related work and DPO certified
- One Chief Officer D.P. certified
- Three D.P. officers ( 2nd Officer)
- One electrician officer
- One chief engineer
- One first engineer



Any additional crew or adjustment to charterer's or their client specific requirements will be subject to additional agreed daily rates, acceptable standard and qualifications of staff. All other project specific personnel are to supplied by charterer.

### 5.2 Project Management

It is anticipated that the Client will provide project management for the work scope to be undertaken. However, Oceanteam can provide project engineering and logistical support.

A dedicated onshore Project Manager will be appointed by Oceanteam for the duration of the work scope.

### 5.3 Key Personnel

Oceanteam's Vessel Manager will be the formal operational point of contact for all project and operational matters between Oceanteam and the Client onshore.



| | Rev : 03 |
| | Date : 7/09/07 |
| | Client : CICSA |

### 5.4 ROV Systems

If client needs Positioning, ROV based subsea services, Power & Umbilical Installation and trenching services Oceanteam will have the first right of refusal.

### 5.5 Positioning Equipment and Personnel

The Vessel will have positioning spread that allows for vessel sub-sea positioning at being agreed rates. The spread is operated on a 24hr basis with two suitable qualified positioning surveyors st to be agreed rates.

### 6.0 Vessel Specification

Find specifications in attached Email.





# Amendment To Contract Form

## Amendment No.2

to

### Bimco Supplytime 2005

Between CICSA and Oceanteam dated 13 September 2007

| Charterers | Owners |
|---|---|
| Construcciones Integrales del Carmen, SA de CV Lote 1 "B Manzana "M" Parque Industrial Portuario Languna Azul Ciudad del Carmen Campeche Mexico | Oceanteam Power & Umbilical Shipping AS, North Ocean 2 KS Tvelterasvelen 12 PO Box 463, Nesttun N-583 Bergen Norway |
| Tel: 0052 938 3844547 Fax: 0052 938 3844548 | Tel: 0047 55108240 Fax: 0047 55108249 |

To all parties – This amendment shall form part of above referenced contract between parties detailed. Everything contained herein shall be read in conjunction with the original contract and form an integral part of said contract. Additionally anything contained herein shall take precedent over anything contained in the original contract except where as amended by any subsequent "Amendment to Contract" sequentially higher than this form.

This Amendment to Contract contains 8 amendments to the original terms and conditions of this Contract as follows: -

---

NEW CLAUSES IN PART II

### Clause 50

'50.1 Owners and Charterers have agreed that the Vessel shall be modified and upgraded to increase its accommodation capacity ('the Accommodation Modifications') and that in accordance with terms of Part II Clause 4 of the Charterparty, Charterers agreed to pay the sum of US$2,800,000 as consideration for the costs of the Accommodation Modifications. However, lines 92-101 shall not apply to the Accommodation Modifications, so that Charterers are not required to remove the Accommodation Modifications prior to redelivery of the Vessel, nor shall Charterers have any responsibility for repair and maintenance of the Accommodation Modifications.'

'50.2 On 14 October 2008 Owners received the sum of US$1,000,000 from Charterers as a first instalment and the balance of US$1,800,000 remains outstanding ('the Accommodation Modification Balance')

### Clause 51

'51.1 Subject to 52.1(c) Charterers agree to pay Owners the sum of US$525,000 ('the Crane Modifications Costs') in respect of modifications to the crane equipment and systems on the vessel ('the Crane Modifications ') which shall be paid by Charterers in accordance with clause 52.1 below'



## Clause 52

52.1 The Owners and Charterers agree that the aggregate of the Accommodation Modification Balance and the Crane Modification Costs being a total of up to US$2,325,000 shall be paid as follows:

(a) one instalment of US$300,000 due by close of business (in Mexico City, Mexico) on 16th January 2009

(a) one instalment of US$300,000 due by close of business (in Mexico City, Mexico) on 16th January 2009

(b) seven instalments each of US$260,000 each due by close of business (in Mexico City, Mexico) on the 15th day of each month, the first instalment being due on 15th February 2009 and

(c) the ninth and final instalment of US$205,000, subject to confirmation and approval by Charterers of the Crane Modification Costs. Owners to provide all necessary supporting information and documents to Charterers in respect of the Crane Modification Costs by 1 March 2009. Once agreed, the ninth and final instalment to be due by close of business (Mexico City, Mexico) on the 30 September 2009.

'52.2   In the event that Charterers do not pay any of the instalments by the dates specified in Clause 52.1 Owners will serve notice that, commencing from the date of Owners notice, Charterers have 3 business days in Mexico ('the Grace Period') to pay the outstanding instalment  and such notice, which shall be deemed served when transmitted to either the fax number or the e-mail address stated in Box 3 of the Charterparty or in substitution by service of a hard copy of such notice at the business address of Messers Clyde &Co solicitors, London. Upon expiry of the Grace Period, Owners may at any time thereafter terminate this charterparty by giving the Charterers written notice of termination and the aggregate of all instalments which are outstanding as at the date of the termination notice shall become due and payable immediately. Furthermore, termination shall be without prejudice to any other rights Owners may have and shall not relieve the Charterers of any obligation for Hire or any other payments due to Owners at that date.'

## Clause 53

'53.1 Charterers agree to pay Owners the sum of US$2,772,000 in respect of the cost of delays to delivery of the Vessel arising from the Accommodation Modifications ('Compensation for Accommodation Delay')'

'53.2 Compensation for Accommodation Delay shall be paid to Owners in 24 monthly instalments, commencing 60 days after delivery of the Vessel  in accordance with this charterparty ('the Monthly Due Date'), each in the sum of  US$115,500 plus interest from the date of the first Monthly Due Date at a rate of 0.5% per month on the balance which is outstanding.'

'53.3   Where any instalment due under Clause 53.2 is not paid on the Monthly Due Date Owners will serve notice that, commencing from the date of Owners notice,  Charterers have 3 business days in Mexico ('the Grace Period') to pay the outstanding instalment  and such notice , which shall be deemed served when transmitted to either the fax number or the e-mail address stated in Box 3 of the Charterparty or in substitution by service of a hard copy of such notice at the business address of Messers Clyde &Co solicitors, London. Upon expiry of the Grace Period, Owners may at any time thereafter terminate this charterparty by giving the Charterers written notice of termination, and the aggregate of all instalments which are outstanding as at the date of the termination notice shall become due and payable immediately. Furthermore, such termination shall be without prejudice to any other rights Owners may have and shall not relieve the Charterers of any obligation for Hire or any other payments due to Owners at that date.'

## Clause 54

No failure to exercise, nor any delay in exercising, on the part of the  Owners, any right or remedy under this charterparty shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in this charterparty are cumulative and not exclusive of any rights or remedies otherwise provided by law.



**Clause 55**

The provisions set out above in clauses 51 to 54 are the entire agreement between the parties with respect to all issues, claims and liabilities whatsoever with respect, related or associated in any way to the Accommodation Modifications and the Crane Modifications (installation and further cancellation of the 500 mts. Crane and the delivery and reinstallation of the 100 mts. Crane in substitution of said 500 mts. crane in the vessel) including and not limited to any vessel delivery delays, drawings, engineering and/or professional third party services cost and expenses, etc. and no additional invoices should be charged to Ciesa for any of those or similar concepts, in full and final settlement of the same.

**Clause 56**

Owners to have an option to propose a new delivery window between 1 September 2009 to 30 September 2009 for the Vessel, so as to permit Oceanteam to use the Vessel internally for cable laying project after Owners take delivery of the vessel from the yard Metalship where the Vessel was built.

Owners to exercise this option in writing no later than close of business Wednesday 21 January 2009 and Charterers to give Owners a final decision about accepting or rejecting the proposed delivery date within 48hrs after receiving a signed addendum from Owners with new delivery date 1 September 2009 and cancelling date 30 September 2009.

**Clause 57**

The Vessel is to be delivered to Charterers at Vigo, Spain, 00:01 am on 1 February 2009, in accordance with the specification agreed 17 September 2007 as amended so as to account for the Accommodation Modifications , and Charter Hire as specified in Box 20 shall start on 3rd February 2009 at 00:01 am and no Mobilisation charge to be payable (boxes 5, 6, 7 and 12 to be so amended).

*The persons signing below hereby confirm that they have authority so to do. Signature by both parties below serves to confirm acceptance, acknowledgement and agreement to all contained herein.*

For and on behalf of Charterers

Name  JOSE J HERNANDEZ G.

Signature

Date  16 January 2009

For and on behalf of Owners

Name  A UMA DIXON

Signature

Date 16 January 2009

0813575 2891541.1

# Amendment To Contract Form

## Amendment No.3

to

## Bimco Supplytime 2005

Between CICSA and Oceanteam dated 13 September 2007

| *Charterers* | *Owners* |
|---|---|
| Construcciones Integrales del Carmen, SA de CV Lote 1 "B Manzana "M" Parque Industrial Portuario Languna Azul Ciudad del Carmen Campeche Mexico | Oceanteam Power & Umbilical Shipping AS, North Ocean 2 KS Tveiterasveien 12 PO Box 463, Nesttun N-583 Bergen Norway |
| Tel: 0052 938 3844547 Fax: 0052 938 3844548 | Tel: 0047 55108240 Fax: 0047 55108249 |

To all parties – This amendment shall form part of above referenced contract between parties detailed. Everything contained herein shall be read in conjunction with the original contract and form an integral part of said contract. Additionally anything contained herein shall take precedent over anything contained in the original contract except where as amended by any subsequent "Amendment to Contract" sequentially higher than this form.

This Amendment to Contract contains [two] amendments to the original terms and conditions of this Contract as follows: -

---

**Delete Clause 57 and Replace with:**

"Clause 57:

The Vessel is to be delivered to Charterers between 1 and 30 September 2009 (Box 5 & 6 to be so amended), in accordance with the specification agreed 17 September 2007 as amended so as to account for the Accommodation Modifications with Owners giving notice 30, 15, 10, 5 and 1 day prior to the specific date proposed for delivery. If Owners wish to propose an early delivery date Owners shall give the Charterers notice 30 days prior to the proposed early delivery date (the "Early Delivery Date") and Charterers shall either reject at its own discretion, within 4 days of receiving Owners notice or be deemed to accept the New Delivery Date. If rejected, Owners shall delivery the Vessel on September 30 2009.

Delivery to take place in Vigo, Spain or at a mutually agreed safe port or anchorage in Charterers favour. (Box 7 to be so amended). If delivery is to take place at a safe port or anchorage different than Vigo, then revised delivery terms are to be mutually agreed between the parties by no later than 30 August 2009 or 30 days prior to the early delivery Date. In any event, Charter Hire as specified in Box 20 shall commence upon delivery of the vessel in accordance with the terms of the Charterparty including, but not limited to Clauses 2 and 5, and no Mobilisation charge to be payable (Boxes 5, 6, 7 and 12 to be so amended)."

Add:

"Clause 58:

Owners may, at their sole discretion (not to be unreasonably withheld), agree to allow a sublet of the Vessel (Box 29 & Clause 42 to be so amended), so long as sub-charterers are a solvent company who can provide references and not competing directly against any of the Owner's other vessels. Charterers shall give Owners written notice of their intention to sub-charterer and provide all necessary

**EXHIBIT B**

North Ocean II KS
Tveitaråsveien 12
N-5853 BERGEN
Norway
Tel:   +47 5510 8240
Fax:   +47 5510 8249
Web:   www.oceanteam.no

Construcciones Integrales del Carmen, SA de CV
Lote 1 "B Manzana "M"
Parque Industrial Portuario
Languna Azul
Ciudad del Carmen
Campeche
Mexico                                            28 August 2009

Dear Sirs,

**North Ocean 102 / CICSA CP dd. 13.09.07**

We refer to the above charterparty and, pursuant to clause 2(c), hereby give notice that we will be unable to deliver the vessel by the cancelling date of 30th September 2009.

The vessel is currently on hire and is in the process of being mobilised by the charterers for an underwater cable-laying operation. For reasons entirely beyond our control, mobilisation of the vessel has overrun significantly, furthermore our current charterers' project is also severely delayed, again this is for reasons beyond our control and which we could not have anticipated.  Based on our discussions with them on when progress will occur and allowing sufficient time for demobilising the specialist equipment on board and restoration of the Vessel to the specification required by your Charterparty, we now conclude that we shall be able to deliver the Vessel to you by 1 July 2010.

Yours faithfully,
For and on behalf of
**North Ocean 2 KS**
Haico Halbesma

Page 1 of 1
QAF 29 C7

**EXHIBIT C**



CONSTRUCCIONES INTEGRALES DEL CARMEN S.A. DE C.V

August 28, 2009

To: Oceanteam Power & Umbilical Shipping AS North Ocean 2 KS
Tveiterasveien 12
PO Box 463, Nesttun
N-5853 Bergen
Norway
Tel: 0047 55108240
Fax: 0047 55108249
Attn: Mr. Haico Halbesma

C/o: BRS, Paris (Attn - Bertrand Boneville)
C/o: Kennedy Marr (Attn – Mark Pasha)
C/o: Clyde & Co (Attn – Edward Mills-Webb/ Andrew Preston)

RE: 'NORTH OCEAN 102" c/p dated 13.9.07

Dear Sirs,

We refer to the notice received today from the owners of the vessel "NORTH OCEAN 102" in relation to the delivery of the vessel to Construcciones Integrales del Carmen SA de CV (CICSA) as per the charterparty dated 13 September 2007, as amended.

As you are aware, CICSA is entitled to receive delivery of the vessel under Amendment No.3 between 1 September and 30 September 2009 at Vigo, the latter date being the cancelling date at Box 8 of the charterparty. However, we understand from Owners' notice that you will be unable to deliver the vessel to Cicsa by 30 September 2009. CICSA understands that Owners' notice intended to give us formal notification of the late delivery under clause 2C of the charterparty.

Unfortunately, and with regret, CICSA cannot accept this further delay to the delivery of the vessel and CICSA hereby gives notice of cancellation of the charterparty under clause 2C with immediate effect.

Owners should therefore arrange for the immediate cancellation of the bank guarantee provided by CICSA under clause 41. Owners should also return the funds provided by CICSA in relation to the Accommodation and Crane Upgrades to our account as follows:

| | |
|---|---|
| Bank: | Societe Generale, New York |
| SWIFT: | SOGEUS33 |
| ABA: | 026004226 |
| In favour of: | SG Private Banking (Suisse) SA, Geneva |
| For further Credit: | Account # 2038100 |
| Attention: | Thierry Casnati |

Owners are kindly asked to confirm that the guarantee is returned and the funds paid within the next 7 days, otherwise all rights are reserved to commence arbitration proceedings and to seek security for the funds due without further warning.

Yours faithfully,

*[signature]* Aug. 28, 2009

Eduardo Arana
For and on behalf of Construcciones Integrales del Carmen SA de CV

# VERIFICATION

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF NEW YORK  )

1.      My name is Christopher Carlsen.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am a member in the firm of Clyde & Co US LLP, attorneys for the Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my beliefs are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        September 18, 2009
               New York, New York

                                                  _____
                                                  Christopher Carlsen

Sworn to before me this 18th day of September, 2009

_____
Notary Public

**DANIEL CORRELL**
**Notary Public, State of New York**
**No. 02CO6102892**
**Qualified in Nassau County**
**Commission Expires Dec. 8, 2011**